# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

N.K. (a minor) and JODY LUECK,

                    Plaintiffs,

v.                                                    Case No. 12-CV-1052-JPS

ST. MARY'S SPRINGS ACADEMY OF
FOND DU LAC WISCONSIN, INC.,

                    Defendant.                        ORDER

Bullying is an extremely serious problem in our country, and it has grown in both scope and visibility in recent years. With the advent of social networking sites, bullied children often find themselves without the benefit of a safe harbor. Not only must they be on guard at school, but also now at home, where there are digital portals—computer, tablet, and phone—to yet more ridicule. The national media has covered the issue extensively, after several horrifying incidents that ultimately led to suicide.[1]

With that increased visibility, though, there has also been a growing recognition amongst those who have covered bullying extensively that society must be careful to define the term "bullying" properly. Emily Bazelon, Op-Ed, *Defining Bullying Down*, N.Y. TIMES, March 11, 2013. Available online at *http://www.nytimes.com/2013/03/12/opinion/defining-bullying-down.html.* One must be careful not to label as bullying every single instance of spiteful conduct between children. Rather, as the bullying scholar

---

[1] The Court will not go into detail or specify the widely-publicized names of those who took their young lives after suffering from bullying; suffice it to say that a quick Google search for bullying yields an unbelievably large number of stories on the topic.

Emily Bazelon has pointed out in the New York Times, psychologists tend to identify bullying as a repeated course of conduct involving a power imbalance—typically one individual with more social status "lording it over another person, over and over again, to make him miserable." *Id.*

This is an exceedingly difficult distinction to make. Teachers and parents are not privy to every interaction between children, and thus cannot know the precise contours of a given situation. And, of course, biases (both innate and developed) play a role, too. Parents of children who have been treated poorly are, perhaps, more likely to assume the best of their child and the worst of others—that their child has been the victim of repeated and entirely unwarranted bullying.[2] Teachers, on the other hand, have a limited set of observations that inform their diagnosis of the situation: the quality of a child's schoolwork, interactions with the child's parents, and the nature of the child's interaction with his fellow students, among many other things.

The ability of any given judge to diagnose a situation fares no better. To be sure, a judge will have access to an extensive amount of documentation on the topic—from depositions of school employees, students (both allegedly bullies and the bullied), and parents; to disciplinary referral forms; to copies of communications between school officials and parents.

This Court had access to all of those items, and yet still believes the picture is somewhat unclear. Here is what the Court can say: a group of students at St. Mary's Springs Academy ("St. Mary's") repeatedly teased the plaintiff, a minor student whom the Court will refer to as N.K. They made

---

[2]Meanwhile, parents of the perpetrators, reluctant to view their child as a bully, probably would see such negative actions as "kids being kids" or as a two way street between the children.

exceptionally rude comments about N.K.'s ethnicity, perceived sexuality, and demeanor. The conduct lasted for several months, and caused N.K. enough pain that his mother, Jody Lueck (also a plaintiff in this matter) made several incursions to St. Mary's on N.K.'s behalf. If that were the full story, the Court would have no trouble labeling this a clear-cut case of bullying. But, as with most everything in life, this situation is not so cut and dry, for N.K., himself, apparently was not an entirely innocent victim. Indeed, the evidence shows that he, too, occasionally made disparaging remarks, including racial epithets, to certain classmates and took other aggressive actions against the alleged bullies. Perhaps this resulted from his being fed up with several months of bullying. Perhaps he invited some of the other students' conduct in a classic case of escalating hostility. Perhaps it was a little of both. In the end, the question of "who started it?" revolves around "he said she said" reports. Those are playground inquiries without a clear answer. Indeed, perhaps there is no answer. Most every piece of information in this story has been filtered through the underdeveloped but highly active minds of middle school students before ever reaching an adult. In all likelihood, N.K. believes he was entirely the victim, whereas the alleged bullies probably view him as an occasional aggressor. In the end, the Court—and the parents and teachers involved—may never actually know which is the case. Suffice it to say that, while the Court empathizes with N.K., it is reluctant to make a definitive determination that he was, in fact, the victim of bullying

Nor, in the final analysis, would such a definitive statement be determinative. The Court is not required to decide, legally, whether N.K. was bullied. Rather, the Court is called upon to answer only whether St. Mary's should be held liable under Title VI and Title IX of the Civil Rights Act for

Case 2:12-cv-01052-JPS   Filed 08/16/13   Page 3 of 23   Document 35

racial and gender discrimination against N.K., due to its failure to stop the alleged bullies' hateful actions.[3]

That is a very tough question, and the foregoing discussion—while not necessary to answer the question, itself—hopefully clarifies two very important considerations. First, the Court sympathizes with N.K.[4] and all victims of such negative behavior. The Court shares the belief that N.K. and every other child should be able to pursue their education without the added pressure of dealing with such negative influences. However, second, the Court cannot make that belief a reality. Indeed, no court decision will ever be able to end bullying. There will always be spats between children. Certain children will always say and do nasty things to one another. Try as they might, school officials will not be able to stop this, either, even if courts such as this one were to begin holding schools liable when their students engaged in reprehensible behavior. No matter how many judgments courts may hand out, the often cruel nature of children will still prevail over newly propagated rules and instructions.

As such, the Court views its task, here, as searching for some culpable action on behalf of the school that could reasonably support a discrimination claim. However, the scope of the Court's inquiry is limited, as "[j]udges must be sensitive to the effects on education of heavy-handed judicial intrusion into school disciplinary issues." *Doe v. St. Francis School Dist.*, 694 F.3d 869,

---

[3] N.K. alleges several other claims for relief, which the Court will discuss later; however, the centerpiece of his argument are the Title VI and Title IX discrimination claims.

[4] The Court has extensively reviewed all of the submitted evidence, and there is no doubt that N.K. was the subject of frequent and seemingly unwarranted nasty behavior by his fellow students.

873 (7th Cir. 2012). Anything more extensive would take the remarkably grey area of assessing and addressing behavioral problems out of the hands of those on the front lines and place it in the hands of a reviewer (the judge) who was not present and will never be able to fully understand the dynamics of a school situation. This is not to say that the Court believes a school can *never* be liable under the theory advanced by N.K. Of course, as the Court will discuss further, if there is evidence to establish knowledge and deliberate indifference on the school's behalf, then the school may very well be liable—and rightly so. But, here, St. Mary's simply is not so culpable, and the Court will not expand or relax the standards to find otherwise.

Thus, for the following reasons, the Court is obliged to grant St. Mary's motion for summary judgment and dismiss this action.

1.    BACKGROUND

At the outset, the Court must note that there are very few facts that the parties *do not* dispute in this matter. At almost every turn of N.K.'s and Lueck's proposed findings of fact, St. Mary's counters with several affidavits that directly contradict N.K.'s statements. And, N.K.'s and Lueck's responses to St. Mary's proposed findings are not much different—although St. Mary's proposed findings and replies are typically more firmly planted in citations to the record. Obviously, someone is not telling the truth, but the Court does not feel it appropriate to make credibility determinations on the state of the record. Most often, N.K.'s and Lueck's proposed findings rely on Lueck's own affidavit and unclear references in the record—essentially, they are nothing more than the sort of conclusory allegations the Seventh Circuit has often frowned upon. *See, e.g., Gobitz v. Corvilla, Inc.,* 196 F.3d 879, 882 (7th Cir. 1999). Nonetheless, the Court will try to wade through this minefield without

discounting too many of Lueck's facts, in an attempt to draw all reasonable inferences in her favor, as it must. *EEOC v. Target*, 460 F.3d 946, 954 (7th Cir. 2006).

N.K. enrolled at St. Mary's in the middle of his sixth grade year, in 2011. (PPFF ¶ 7). The harassment he complains of apparently did not begin immediately; in fact, it only began to ramp up in August of 2011, when N.K. tried out for the school's football team. (*See* PPFF ¶ 8). At that time, his teammates began a barrage of insults and insulting behavior toward N.K. (*See, e.g.*, PPFF ¶¶ 9–11). This included various insults referencing N.K.'s ethnicity[5] and perceived homosexuality.[6] (PPFF ¶¶ 9–10).[7] It also escalated to physical touching, as certain classmates would occasionally feign sexual acts against N.K., and perform various other classic bullying activities, from ruffling his hair, to pushing him into lockers, to mocking the way he ate and walked. (PPFF ¶ 11).

This intense harassment prompted Lueck to speak to two officials at St. Mary's—Erin Flood, an assistant principal with control over the lower

---

[5]N.K. is of Asian descent, and so his teammates variously called him "Mongol," "gook," and "Wang," among various other racial epithets

[6]N.K.'s teammates referred to his sexuality often, regularly calling him a "fag" or "faggot," "gay," a "queer," a "girl," and a "queen"; they also made fun of N.K. and his close male friend for being a gay couple, and directed them to make Asian babies together.

[7]While St. Mary's disputes many of these facts, it does not point to countervailing evidence to show that the facts are untrue. In fact, St. Mary's only objects to the content of the alleged statements from N.K.'s teammates. N.K. has produced some genuine evidence to establish these facts. Therefore, the Court cites them with approval, here, at this stage of the proceedings. However, the defendants are certainly correct that the nature of those statements is not ultimately a material fact.

grades of St. Mary's, and Bobbijo Amerling, an administrative assistant. (PPFF ¶ 16). At that time, Lueck told both Flood and Amerling that students had been calling N.K. various names at football practice. (PPFF ¶ 16). Flood responded to the complaint by interviewing four students and contacting their parents. (DPFF ¶ 82).

Apparently the school did not respond quickly enough to satisfy Lueck, because Lueck filed a "TABB" report with the school on September 7, 2013. (PPFF ¶ 20). TABB reports are part of St. Mary's Turning Around Bullying Behaviors, or "TABB," program. (DPFF ¶¶ 17–19). Both St. Mary's employees and also parents may file a TABB report, after which time St. Mary's employees—who have received training—may conduct an investigation on the facts of the complaint. (DPFF ¶¶ 17–19). Lueck filed one of these TABB reports, in which she indicated that N.K. was being harassed by other students, including on Facebook. (PPFF ¶ 20). Unfortunately, Flood, who was tasked with investigating the report, never looked into the Facebook allegations. (PPFF ¶ 23, and Def.'s Resp. thereto).

The school did, however, arrange for a PowerPoint presentation to be presented to N.K.'s class on September 19, 2011, which addressed the prevention of bullying. (DPFF ¶ 19).

Unhappy with St. Mary's response to her report, Lueck again approached Ms. Flood later in September of 2011. (PPFF ¶ 24). This time, Lueck reported that N.K.'s fellow students had begun calling him the name of another student who had previously left St. Mary's, allegedly as a result of bullying. (PPFF ¶ 24).

Lueck also got in touch with N.K.'s football coaches and told them about the racial comments that players were making to N.K. (PPFF ¶ 25). The

coaching staff obviously took this report seriously, as they immediately discussed the matter with each other through email exchanges, then addressed the issue with the team; one coach even spoke directly with a player who had allegedly been one of the main instigators of the insulting behavior. (PPFF ¶ 28, 97).

Shortly thereafter,[8] Lueck again met with Flood to address the issues at football practice, and to address the fact that Lueck had gotten in touch with N.K.'s coaches. (PPFF ¶ 29). Lueck also again brought up allegedly-occurring Facebook harassment. (PPFF ¶ 30). Lueck asserts that Flood refused to act on either aspect of her complaint, but fails to cite supporting evidence in favor thereof. (Pl.'s Resp. 7).

Lueck continued to complain to Flood. She allegedly informed Flood of continued harassment and a "hit list," which was rumored to include names of students who others wanted to leave school. (PPFF ¶¶ 31–32).

Flood's actions failed to satisfy Lueck, and therefore Lueck alleges that she began filing multiple TABB reports. (PPFF ¶ 36). In fact, she alleges that she filled out nineteen TABB reports during the first half of November. (PPFF ¶ 36). St. Mary's disputes that allegation, pointing to affidavits from Flood and Amerling, who state that they do not remember receiving any TABB

---

[8]As with much of the facts in this case, the parties dispute the precise time of this meeting. Lueck asserts that the meeting occurred in October of 2011, while Flood believes the meeting occurred in December of 2011. They have filed cross-affidavits on this fact (and many others). Ultimately, the precise time of the meeting is not extremely relevant, and the Court need not resolve this dispute.

Case 2:12-cv-01052-JPS   Filed 08/16/13   Page 8 of 23   Document 35

reports from Lueck.[9] (PPFF ¶ 36). These reports contained the same allegations of mistreatment by N.K.'s classmates—bigoted insults and occasional physical mistreatment of N.K. (PPFF ¶ 36).

Lueck then had more contact with St. Mary's officials and teachers, though the nature of that contact is largely disputed. She had a parent-teacher conference with N.K.'s teachers on November 16, 2011. (PPFF ¶ 37). She asserts that she told N.K.'s teachers everything that had been going on; the teachers disagree, and stated in their depositions that Lueck was generally positive at the conference. (PPFF ¶ 37, and Def.'s Resp. thereto). Lueck alleges that she next contacted Flood, only to be rebuffed; Flood, of course, denies that this conversation occurred and further denies that she ever rebuffed Lueck. (PPFF ¶ 38, and Def.'s Resp. thereto). Lueck also asserts that she filed more TABB reports, a fact that Flood and Amerling both dispute. (PPFF ¶¶ 39–40, and Def.'s Resp. thereto).

Throughout this time, N.K. occasionally told his teachers that his fellow students were calling him names or bullying him. (DPFF ¶¶ 33, 35). These situations were all addressed, or N.K. informed the teachers that he was joking, or the problem had abated. (DPFF ¶¶ 34, 36).

---

[9]This allegation is like much of Lueck's—based solely on her own declaration. St. Mary's has turned over many documents and seems to have been extremely open throughout discovery, and therefore the Court has trouble believing that St. Mary's would fail to file or destroy TABB reports it received from Lueck. But that is apparently what she wants us to believe, as she has not produced any copies of these allegedly submitted reports. Perhaps she merely filled out the reports but failed to turn them in—that is all her proposed findings refer to. But, if that is the case, then that fact is totally irrelevant, and both Lueck and her attorney should be aware of that fact. Nonetheless, because the Court does not view this as a material fact, the Court will disregard the dispute.

N.K. then had an altercation with another student on December 1, 2011. (PPFF ¶ 41). At that time, he fought with another student. (PPFF ¶ 41, 49). The parties—both N.K. and the other student—dispute the actual sequence of events leading to this altercation, and precisely who the aggressor was. (PPFF ¶ 49, and Def.'s Resp. thereto). Shortly after the altercation, Flood told Lueck that she believed N.K. was responding to a form of bullying when he fought with the other student. (PPFF ¶ 48). Nonetheless, both N.K. and the other student received equal punishment for their fight. (PPFF ¶ 49, and Def.'s Resp. thereto). As an aside, the Court notes that it does not appear that Flood created a TABB report at the time of the altercation or when Lueck reported bullying on the football team; as to the latter, Flood reported that she believed that the coaches had addressed the situation appropriately and that the season was done, leading her to conclude that a TABB report was unnecessary. (PPFF ¶ 46, and Def.'s Resp. thereto).

Lueck also claims that she requested a safety plan for N.K. shortly after his altercation. (PPFF ¶ 50). She alleges that she asked to be allowed to drop N.K. off late and pick him up early from school. (PPFF ¶ 51). She states that Flood refused to accommodate this request, informing her that doing so would result in N.K. receiving unexcused absences. (PPFF ¶ 51). Flood disputes that this ever occurred, and also disputes that Lueck filed additional TABB reports during the month of December.

It is clear and admitted, though, that at some point—possibly around this time in December—Flood suggested that Lueck tell N.K. to attempt to not react to the bullying. (PPFF ¶ 54). At the same time, she informed Lueck that the school could not do anything without proof of the harassment or

alleged "hit list," and that any problems would not be fixed overnight. (PPFF ¶ 54).

Things apparently calmed down somewhat after the Christmas break. Lueck alleges that she met with Flood or other teachers only approximately three times between January of 2012 and March of 2012. (PPFF ¶¶ 55–57). Of course, Lueck's recollection of those meetings is vastly different than Flood's. Lueck recalls Flood suggesting that N.K. change the way he acted, advising against N.K. seeing an outside counselor, and refusing to provide a safety plan. (PPFF ¶¶ 55–56). Flood, on the other hand, disputes that any of those allegations occurred. (Def.'s Resp. to PPFF ¶¶ 55–56). At a parent-teacher conference in February of 2012, N.K.'s teachers all stated that they were not aware of any bullying to N.K.

The apparent calm was not to last, though. On April 4, 2012, N.K. began participating in a Facebook conversation about a group picture. (PPFF ¶ 58). The conversation quickly devolved into insults between N.K. and several other students, most notably M.B. (PPFF ¶ 58). At this point, though, it is very important to note the true nature of this conversation. (*See* Kinne Aff., Ex. M). N.K. participated in this conversation willingly and even aggressively insulted M.B. on numerous occasions therein. (*See* Kinne Aff., Ex. M). This is not necessarily a material fact, but it is important to note that N.K.'s and Lueck's recitation of the facts on this are extremely one-sided and fail to acknowledge N.K.'s own participation in the racially derogatory nature of the conversation.

Shortly after this Facebook incident occurred, N.K. flipped M.B.'s desk over in class. (PPFF ¶ 62). Flood investigated the incident and determined that N.K. should be suspended for a half day, as punishment.

(PPFF ¶¶ 64–66). Before making that determination, though, she met with Lueck and N.K., at which time she showed them a copy of the Facebook discussion, with N.K.'s own contributions highlighted. (PPFF ¶ 66). Flood explained the seriousness of N.K.'s actions, suggested that he take accountability in front of his classmates, and informed him that further repercussions would follow for similar behavior. (PPFF ¶¶ 67–68).

Shortly after this incident, N.K. was involved in another: he slapped another student and pushed his head into his computer. (PPFF ¶ 71). As a result, Flood filled out a TABB report, which she asserts was based upon the general negative attitude of the class, and N.K. was assigned to complete a bullying presentation with other members of the class. (PPFF ¶ 72, and Def.'s Resp. thereto).

To address these issues, Lueck requested a joint meeting with Flood, St. Mary's president and priest, and another parent to discuss what she believed were bullying problems at the school. (PPFF ¶ 70). The school held this meeting. (PPFF ¶ 73). At some point thereafter, Lueck asked the school's guidance counselor about receiving a safety plan to help address N.K.'s needs; the counselor offered Lueck a brochure for a camp designed to help children stand up for themselves. (PPFF ¶ 73).

The school then held another meeting, on April 19, 2012, at which many of N.K.'s fellow students and their parents were present. (PPFF ¶ 75). The meeting did not go the way that Lueck would have liked (the parties, of course, disagree over who is to blame for that), and she believes that the meeting was an attack on her and N.K.. (PPFF ¶ 75).

Apparently, that was enough for her. She withdrew N.K. from school on April 23, 2012, and demanded that St. Mary's implement a safety plan for

him. (PPFF ¶¶ 76–77, 80). St. Mary's refused to do so, and when Lueck did not return N.K. to school, St. Mary's threatened and ultimately filed a truancy complaint against Lueck, which were ultimately dismissed because Lueck registered to homeschool N.K. (PPFF ¶ 77–81, 88).

Lueck then brought this case against St. Mary's. The parties engaged in discovery and the matter is now before the Court on St. Mary's motion for summary judgment.

2.    DISCUSSION

The Court should grant summary judgment here, if it finds that there is no genuine dispute as to any material fact and that St. Mary's is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court must consider whether to do so on a number of claims. First, and most importantly, it must address the plaintiffs' Title VI and Title IX claims, which it will address together. If it finds that either the Title VI or Title IX claims should survive dismissal, then it must address the plaintiffs' state law claims. (Pl.'s Resp. 28). If, however, it dismisses those claims, then it need not rule upon them. (Pl.'s Resp. 28). Finding the latter, as the Court discusses later, it will dismiss those claims without ruling upon them. Finally, the Court will also dismiss the plaintiffs' punitive damages claims, as they assent to that dismissal. The Court now turns to the substance of St. Mary's motion for summary judgment as it relates to the plaintiffs' Title VI and Title IX claims.

2.1    Title VI and Title IX Discrimination Claims

Both Title VI and Title IX are targeted toward recipients of federal funds. *Parker v. Franklin Cty. Community School Corp.*, 66 F.3d 910, 917 (7th Cir. 2012). Title VI prohibits racial discrimination by such recipients, while

Title IX prohibits discrimination on the basis of gender. *Id.* The Supreme Court has interpreted both laws to imply a private right of action entitling a successful plaintiff to damages. *See, e.g., Cannon v. University of Chicago*, 441 U.S. 677, 717 (1979); *Franklin v. Gwinnett Cty. Public Schools*, 503 U.S. 60, 76 (1992); *Grove City College v. Bell*, 465 U.S. 555 (1984). The Seventh Circuit has also recognized the similarities between the two claims, noting that the two "operate in the same manner." *See, e.g., Doe v. Smith*, 470 F.3d 331, 338 (citing *Cannon*, 441 U.S. at 684–85), abrogated on other grounds as recognized by *Trentadue v. Redmon*, 619 F.3d 648 (7th Cir. 2010).

Generally, to prevail on a claim for hostile educational environment under Title VI or Title IX, as the plaintiffs are putting forth, here, they must show that the student participated in a federally-funded program that was so pervasively hostile to the student's race or gender that he was deprived of access to the educational benefits of the program. *See, e.g., Qualls v. Cunningham*, 183 Fed. Appx. 564, 567 ("To establish a hostile educational environment under Title VI, Qualls must show that the alleged harassment was severe or pervasive enough to deprive him of access to educational benefits."). Here, where the plaintiffs are suing a school under what is essentially a *respondeat superior* theory, they must also prove that an official of the school had "actual knowledge" of, and was "deliberately indifferent to," the conduct in question. *See, e.g., Doe v. St. Francis School Dist.*, 694 F.3d 869, 871 (citing *Gebser v. Lago Vista Independent School Dist.*, 524 U.S. 274, 285 (1998)); *Doe v. McLean Cty. Unit Dist. No. 5 Bd. of Directors*, 593 F.3d 507, 512 (7th Cir. 2010); *Hansen v. Bd. of Trustees*, 551 F.3d 599, 605 (7th Cir. 2008); *J.F.K. v. Troup Cty. School Dist.*, 678 F.3d 1254, 1260 (11th Cir. 2012)).

The Court views these requirements as essentially three separate elements: (1) program acceptance of federal funding; (2) pervasive hostility to race or gender in the program; and (3) actual notice and deliberate indifference on behalf of the school district. It will address each separately, below.

### 2.1.1    St. Mary's Acceptance of Federal Funds

St. Mary's does not dispute that it accepts federal money. (PPFF ¶ 90, and Def.'s Resp. thereto). Therefore, the Court will accept the fact as true, and find that this requirement is satisfied.

### 2.1.2    Pervasive Race- or Gender-Based Hostility

To find that race- or gender-based hostility is actionable, the Court must first find that the hostility is "'so severe, pervasive, and objectively offensive' that it has a 'concrete, negative effect,' on the victim's access to education." *Gabrielle M. v. Park Forest-Chicago Heights, IL, School Dist.*, 315 F.3d 817, 821 (7th Cir. 2003) (quoting *Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 633 (1999)). The Seventh Circuit, however, has acknowledged that there is a threshold question in these cases of whether the alleged hostility was, in fact, based upon race or gender. *See, e.g.*, *Gabrielle M.*, 315 F.3d at 821 ("There is a threshold question, altogether reasonable and rational, of whether a five or six year old kindergartner can ever engage in conduct constituting 'sexual harassment' or 'gender discrimination' under Title IX.") This is likely based upon the Supreme Court's recognition in *Davis* that children "regularly interact in a manner that would be unacceptable among adults," leading some students to "engage in insults, banter, teasing, shoving, pushing and gender-specific conduct that is upsetting to the student subjected to it." 526 U.S. at 651–52. This has led at least one district court in this circuit and others

Case 2:12-cv-01052-JPS   Filed 08/16/13   Page 15 of 23   Document 35

from other circuits to examine whether the harassers were actually motivated by personal animus, instead of one's protected class. *See, e.g.*, *Vidovic v. Mentor City School Dist.*, 2013 WL 395263, at *17 (N.D. Ohio January 31, 2013); *Burwell v. Pekin Community High School Dist. 303*, 213 F. Supp. 2d 917, 930–31 (C.D. Ill. 2002).

St. Mary's urges this Court to take the same approach, but the Court does not believe it is appropriate, here. To begin, it is an extremely slippery slope to attempt to divine whether the harassers' intentions were based upon race or gender hostility or something more personal—particularly at the summary judgment stage. Moreover, the racial epithets and gender-based insults used here were extremely specific, going precisely to N.K.'s personal characteristics. This is strong evidence that the harassers were motivated, at least in part, by N.K.'s race and gender. Granted, this is a very difficult determination to make—and, if this case were to proceed to trial, it would likely be an issue over which the parties could present evidence. It is nearly impossible to know what transpired in the heads of N.K.'s harassers and, for that reason, it would be particularly inappropriate to grant summary judgment on that basis.

The next question the Court must answer goes to whether the hostility was based upon N.K.'s race or gender. Quite clearly, some of the comments were directed at N.K.'s race, and would therefore be actionable under Title VI if they had the requisite negative effect upon him. On the other hand, the offensive comments related to his gender are much more difficult to place within Title IX's protections. More specifically, the gender-based comments derived primarily from N.K.'s perceived homosexuality and effeminacy. Certain of the students testified that names like "fag" or "faggot" were not

Case 2:12-cv-01052-JPS   Filed 08/16/13   Page 16 of 23   Document 35

used to actually mean homosexual, but are generally used terms, potentially taking them outside of the realm of hostility based on N.K.'s perceived homosexuality. Nonetheless, the Seventh Circuit and other courts have recognized that discrimination based upon one's failure to conform to stereotypical gender ideals may result in a finding of gender discrimination. *See, e.g.*, *Hamm v. Weyauwega Milk Products, Inc.*, 332 F.3d 1058, 1064 (7th Cir. 2003); *Doe v. Brimfield Grade School*, 552 F. Supp. 2d 816, 823 (C.D. Ill. 2008); *Howell v. North Central College*, 320 F. Supp. 2d 717, 720 (N.D. Ill. 2004); *Theno v. Tonganoxie Unified School Dist.*, 377 F. Supp. 2d 952, 964 (D. Kansas 2005). As such, given that much of the harassers' rhetoric seems to have been based upon N.K.'s failure to conform to gender stereotypes, the Court believes it would be inappropriate to dismiss the Title IX claims on that basis at this time.

The final question the Court must address in this regard is whether the harassment was so pervasive as to have a "concrete, negative effect" on N.K.'s access to education. *Davis*, 526 U.S. at 633. St. Mary's argues that the alleged harassment did not impact N.K.'s grades negatively and, therefore, did not have the requisite negative effect. The Court sees this as much more of an issue for trial; it could be that, while N.K. succeeded in school, he perhaps could have *excelled* were it not for the alleged harassment. Moreover, Lueck ultimately determined that the environment was so hostile that she removed him from school—perhaps that was her choice, but if evidence at trial were to establish its necessity, then the Court believes that a rational finder of fact could determine that the harassment had a concrete, negative effect on N.K.'s education.

For all of these reasons, summary judgment would be inappropriate on the basis of the grounds mentioned above.

### 2.1.3    Actual Knowledge and Deliberate Indifference

As such, the Court next turns to examine whether St. Mary's had actual knowledge of the alleged harassment and were deliberately indifferent to it. *E.g.*, *St. Francis*, 694 F.3d at 871. This is because a school cannot be held vicariously liable. *Id.*

On the actual knowledge requirement, the Seventh Circuit has made clear that school officials must have "actual knowledge of misconduct, not just actual knowledge of the risk of misconduct." *Id.* (quoting *Hansen*, 551 F.3d at 605; *J.F.K.*, 678 F.3d at 1260). Recently, the Seventh Circuit found that this was not satisfied where school officials and fellow teachers had felt that a teacher who eventually assaulted a student treated her victim in a potentially inappropriate way. *St. Francis*, 694 F.3d at 872–73. The officials there knew the offending teacher treated her relationship with the student "like a crush." But, they did not know that any actual sexual harassment had occurred, leading the Seventh Circuit to conclude the district lacked actual knowledge.

The situation is slightly different—and slightly more egregious—here. St. Mary's argues that its officials and teacher did not have any actual, firsthand knowledge that students were harassing N.K. using language based upon his ethnicity and perceived sexual orientation. And, to an extent, they are correct. Indeed, there is no evidence that any teacher or official had ever witnessed the use of these terms. However, Lueck's and N.K.'s reports of the use of terms is much more concrete than the vague statements provided about the teacher in *St. Francis*. There, fellow teachers and officials

Case 2:12-cv-01052-JPS   Filed 08/16/13   Page 18 of 23   Document 35

had only a general sense that the offending teacher was acting inappropriately. Here, on the other hand, Lueck and N.K. actually reported firsthand occurrences of racial- and sexuality-based hostility. Given that, particularly in middle school and high school, students will be aware enough to hide their bigoted language from authority figures, the Court believes that these firsthand reports were likely enough to create actual knowledge on St. Mary's behalf.

However, even if St. Mary's had that requisite knowledge, it did not act with deliberate indifference, and therefore the Title VI and Title IX claims against it must be dismissed. *Davis* made clear that deliberate indifference is a high bar for plaintiffs to clear: it exists "only where the recipient's response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances." 526 U.S. at 648. This "does [not] require funding recipients to remedy peer harassment" or punish every allegedly offending student. *Gabrielle M.*, 315 F.3d at 825. Moreover, as earlier noted, the Seventh Circuit recognizes that "[j]udges must be sensitive to the effects on education of heavy-handed judicial intrusion into school disciplinary issues." *St. Francis*, 694 F.3d at 873.

St. Mary's actions were not "clearly unreasonable" and certainly did not rise to the level of deliberate indifference. It is clear from the record that St. Mary's officials investigated incidents after they were reported, spoke with students, and held conferences with parents and teachers, all regarding Lueck's and N.K.'s reports of bullying. They also provided their students and teachers with lessons and training on bullying prevention. Thus St. Mary's took regular and positive action to address the situation. In the Court's eyes that is eminently reasonable.

Lueck insists that she filed 40 TABB reports, but cannot establish evidence of a single one. This makes Lueck's assertions highly questionable. Moreover, regardless of that huge number of reports, the question is whether St. Mary's actions were "clearly unreasonable." Assuming that she actually *did* file the complaints, Lueck likely did not inspire confidence as a reasonable source by doing so, thus further justifying—if only in Lueck's mind's eye—any perceived inaction on St. Mary's behalf.

Finally, N.K.'s own actions—brushing off his own reports of bullying (DPFF ¶ 36) and using derogatory language against other students (DPFF ¶¶ 55–56)—would have justified any tendency on St. Mary's behalf to treat this situation as one of "kids being kids."

Holding that St. Mary's was not deliberately indifferent is also squarely in line with past Seventh Circuit decisions. In *Hendrichsen v. Ball State University*, the Seventh Circuit held that the University was not deliberately indifferent to sexual harassment by one of its teachers when it revealed the victim's identity to the teacher, failed to interview certain witnesses, and did not take extremely swift action against the teacher. 107 Fed. Appx. 680, 685 (2004). In doing so, it particularly faulted the plaintiff for failing to explain why "what the university *did* do—promptly investigating the situation as soon as she told them about it," and warning the teacher, should have been considered clearly unreasonable. *Id.* (emphasis in original). The Court is faced with much the same case here—the plaintiffs argue that St. Mary's should have taken certain additional steps, but fail to make a persuasive argument as to why the steps that were taken were "clearly unreasonable." And, while certainly summary judgment should be precluded where the school made no effort to stop harassment, *see Davis*, 526

U.S. at 654; *Murrell v. Sch. Dist. No. 1, Denver, Colo.*, 186 F.3d 1238, 1243 (10th Cir.1999), that is certainly not the case here, where the evidence amply demonstrates that St. Mary's took steps that were both appropriate and reasonable under the circumstances to stop the harassment. St. Mary's has some level of flexibility to address student conduct—it is not required to take disciplinary action against *every* student accused of misconduct, for instance. *Gabrielle M.*, 315 F.3d at 825 ("*Davis* disapproved of a standard that would force funding recipients to suspend or expel every student accused of misconduct."); *see also Davis*, 526 U.S. at 648.

Moreover, the Court must remain cognizant of the fact that it may only look to instances where St. Mary's had at least actual notice of the incidents to determine that they were deliberately indifferent to those incidents. *Gabrielle M.*, 315 F.3d at 823–24 ("Courts, therefore, have focused on reports or observations in the record of inappropriate behavior to determine when school officials had actual notice."). Here, after practically every report or observed incident, the school followed up in some way, either by investigating the occurrence or by punishing involved students. Accordingly, it is clear that St. Mary's was not deliberately indifferent to those occurrences about which it had actual notice. Deliberate indifference is an element of a Title VI claim, and therefore the plaintiffs have the burden of establishing competent evidence of that fact. *See Smith v. Severn*, 129 F.3d 419, 427 (7th Cir. 1997). The plaintiffs failed to establish that evidence—in reality relying almost entirely upon Ms. Lueck's own self-serving statements in a declaration—and, therefore, the Court is obliged to dismiss this action on its merits.

For all of these reasons, the Court must conclude that St. Mary's did not act with deliberate indifference. Therefore, it must grant St. Mary's motion for summary judgment on the Title VI and Title IX claims. Furthermore, though the plaintiffs did not brief these issues extensively, both parties have made passing reference to certain of plaintiffs' claims, which derive from allegations of discrimination based upon both religion and financial status. To the extent that plaintiff asserted those claims, they too must be dismissed, as they were based upon Title VI and Title IX, and the Court has held that such claims will not lie due to the lack of deliberate indifference.

### 2.2    Dismissal of Punitive Damages and State Law Claims

The plaintiffs have assented to have their punitive damages claims dismissed. Furthermore, because the Court will grant summary judgment on the Title VI and Title IX claims, it lacks jurisdiction over the state law claims—as this is not an action based upon diversity—and will, therefore, dismiss those claims without addressing their merits.

### 3.    CONCLUSION

For the foregoing reasons, the Court will grant St. Mary's motion for summary judgment. It will also dismiss the plaintiffs' state law claims for lack of jurisdiction.

Accordingly,

IT IS ORDERED that St. Mary's motion for summary judgment (Docket #19), be and the same is hereby GRANTED in part, insofar as it relates to the plaintiffs' Title VI, Title IX, and punitive damages claims, and DENIED in part, insofar as it relates to the plaintiffs' state law claims;

IT IS FURTHER ORDERED that the plaintiffs' state law claims be and the same are hereby DISMISSED for lack of jurisdiction; and

IT IS FURTHER ORDERED that, all claims in this matter having been disposed, this matter be and the same is hereby DISMISSED.

The Clerk of Court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 16th day of August, 2013.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge